

**NUMBER 13-24-00134-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

**IN THE INTEREST OF B.M.P.J., A CHILD**

---

**ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5
OF NUECES COUNTY, TEXAS**

---

**MEMORANDUM OPINION**

**Before Justices Benavides, Tijerina, and Silva
Memorandum Opinion by Justice Benavides**

Appellant G.G. (Mother) appeals from an order terminating her parental rights to her minor son, B.M.P.J.[1] The trial court found by clear and convincing evidence that Mother failed to financially support the child for a period of twelve months leading up to the petition, that Mother constructively abandoned the child after removal, and that Mother

---

[1] To protect the identity of the minor child, we refer to him and his relatives by their initials or an alias. *See* TEX. R. APP. P. 9.8.

failed to comply with her court-ordered family service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(F), (N), (O). The trial court also found by clear and convincing evidence that termination was in the child's best interest. *See id.* § 161.001(b)(2). Mother challenges each of these findings on legal and factual sufficiency grounds.[2] We affirm.

## I. BACKGROUND

### A. Removal

The following allegations served as the basis for B.M.P.J.'s initial removal. B.M.P.J., Mother's first child, was born premature on September 21, 2020, weighing only two pounds. When Mother was admitted to the hospital, she tested positive for amphetamines and later suffered a seizure brought on by withdrawal from crystal methamphetamine dependency. She also previously tested positive for amphetamines during a prenatal appointment on May 4, 2020. Mother admitted to hospital staff that she used Xanax and codeine during the pregnancy, and Father admitted to providing Mother with Benadryl, Percocet, Xanax, and hydrocodone during that period.

Mother is intellectually disabled and has been diagnosed with bipolar type schizoaffective disorder, borderline personality disorder, post-traumatic stress disorder, and generalized anxiety disorder. Mother also has a history of suicidal and homicidal ideations. Finally, Mother reported to the Texas Department of Child Protective Services that Father physically abused her. Based on these facts, the Department effected an emergency removal of the child, and the trial court later appointed the Department as the child's temporary sole managing conservator.

---

[2] Father's parental rights were also terminated, but he has not appealed the termination order.

**B.      Prior Case**

In March 2022, the Department obtained an order terminating Mother's parental rights. *In re B.P.*, No. 13-22-00353-CV, 2022 WL 17668192, at *1 (Tex. App.—Corpus Christi–Edinburg Dec. 15, 2022, no pet.) (mem. op.). On appeal, the Department conceded that the trial court lost subject-matter jurisdiction before trial commenced. *Id.*; *see* TEX. FAM. CODE ANN. § 263.401(a), (b). Accordingly, in December 2022, we vacated the termination order and dismissed the case for lack of jurisdiction. *In re B.P.*, 2022 WL 17668192, at *3.

**C.      Department Files a New Petition**

Approximately two weeks before our dismissal, the Department preemptively filed a new conservatorship petition alleging "an immediate danger to the physical health or safety of the child" and seeking emergency protection of the child. In a lengthy supporting affidavit, the Department recounted the circumstances that prompted the initial removal and the facts that led the Department to eventually seek termination in the first case. The affidavit also explained that, in light of the anticipated dismissal of the first case, the Department began reaching out to the parents in October 2022 to reassess their situation. According to the affidavit, Mother and Father agreed to submit to drug testing. Mother's hair follicle test came back positive for amphetamine, methamphetamine, cocaine metabolite, codeine, and the opiate hydrocodone, while her urinalysis was positive for cocaine and the opiate hydrocodone. Mother did not have a prescription for hydrocodone. Father's hair follicle test came back positive for amphetamine and methamphetamine, and his urinalysis was pending at the time the petition was filed. The Department further

3

alleged in the affidavit that Mother and Father currently lived in a home without electricity or running water, that Mother recently admitted that Father was selling drugs out of their home, that Mother was not taking the medications prescribed to treat her mental illnesses, that Mother had recently expressed suicidal ideations, and that domestic abuse remained an ongoing issue. The trial court entered new emergency orders appointing the Department as the child's temporary sole managing conservator days before our memorandum opinion was handed down. B.M.P.J., who had been placed with a foster family upon his initial removal, continued to reside with that family during the pendency of this case.

**D.     Adversary Hearing**

An adversary hearing began on December 13, 2022, and was recessed until January 19, 2023. Mother appeared at the hearing in person and through her attorney of record.[3] The trial court subsequently rendered temporary orders appointing the Department as the child's temporary sole managing conservator. The orders state that the trial court considered the affidavit attached to the emergency petition and the evidence presented during the hearing in reaching its decision. Based on that evidence, the trial court made a finding that "there is sufficient evidence to satisfy a person of ordinary prudence that . . . there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession from who the child was removed." The trial court also made a finding that "there is a substantial risk of

---

[3] The appellate record does not contain a request for a reporter's record, and we have not been provided a transcript from the adversary hearing.

continuing danger if [the child] is returned [to Mother's] home."

**E.     Trial**

A bench trial occurred over two days, beginning on November 13, 2023, and concluding on January 3, 2024.

**1.     Taite Bowers**

Beginning on November 13 and continuing on January 3, Taite Bowers testified in her capacity as a Department caseworker in the previous case and as a Department supervisor in this case. Bowers explained that she helped develop the family service plans for Mother and Father in this case and that each plan was designed to address the Department's specific concerns with that parent. Mother's plan, which became an order of the trial court in January 2023, required her, among other things, to demonstrate a safe and stable home environment for B.M.P.J.; to "successfully complete group parenting classes"; to "visit her child according to the times and days listed on the visitation plan"; to complete a Battering Intervention and Prevention Program (BIPP); to complete an assessment for drug abuse and follow any recommendations for treatment; to submit to random drug testing "with the understanding that a missed drug test . . . will be recorded as a positive drug test"; to "participate in a Psychological Evaluation" and "follow all recommendations made by the assessor"; and to "participate in individual counseling to specifically address issues related to the removal of her child," including "how to cope with the stress of the removal and ways to prevent future neglect." For each service, Mother was provided with the relevant contact information for the service provider. Bowers said Mother participated in the development of the plan and "was in agreement"

5

that these services were appropriate under the circumstances. Mother also signed an acknowledgment that she understood the significance of the plan. Namely, that these services were designed to help Mother demonstrate that she could provide a safe environment for B.M.P.J. and that failure to complete the services could result in the termination of her parental rights.

According to Bowers, Mother "made very minimal progress" on her services and did not complete any of them. For instance, Bowers testified that Mother took her drug assessment and "recently started relapse prevention class in October [2023]," completing nine out of thirty-six hours of group classes, and ten out of sixteen individual sessions. Bowers noted, however, that, as of January 3, 2024, Mother had not attended any of those classes or sessions in approximately six weeks. Bowers also cited BIPP as an example of a service Mother never started.

Bowers noted that Mother was charged with possession of marijuana during the pendency of the case and did not drug test for the first nine months of the case. This prevented her from having visitation with B.M.P.J. because the visitation plan ordered by the trial court required a negative drug test before visitation could occur. Mother's first visitation with B.M.P.J. occurred over Zoom in September 2023, and she continued to test negative for the remainder of the case but also failed to show up for a drug test in December 2023. The visit was originally scheduled to occur in person, and the Department purchased a bus ticket for Mother to travel to Corpus Christi for the visit. However, as Mother would later testify, she was not allowed on the bus because she was "too medicated." Bowers observed the virtual visitation and said that Mother became

6

emotional and cried most of the visit because it was the first time she had seen B.M.P.J. since his initial removal. Mother's only in-person visit occurred in October 2023, and B.M.P.J. slept through most of the visit. The Department scheduled a subsequent visitation for January 2, 2024, and again arranged transportation for Mother to travel to Corpus Christi for the visit; however, Mother informed the Department that she had to leave Corpus Christi before the scheduled visitation. Given the limited interaction between Mother and B.M.P.J. during the two visits that did occur, Bowers said she was unable to observe Mother's parenting skills.

Bowers testified that Mother "has been diagnosed before with bipolar disorder, depression, PTSD, [and] schizophrenia." Bowers also noted that Mother has "a history of suicidal and homicidal tendencies" and "was diagnosed with an intellectual and developmental disability." Bowers acknowledged that Mother had routinely admitted herself into behavioral hospitals during the pendency of the case. Bowers estimated that this occurred "once or twice a month" and credited Mother for always calling the Department to let her caseworker know her location. Other than Mother admitting herself into behavioral hospitals, Bowers had no knowledge of Mother receiving any other mental health care outside of her service plan.

Bowers identified Mother's strengths as her willingness to seek help at behavioral hospitals, her consistent communication with the Department, her "attempts to surround herself with positive people," and her love for B.M.P.J. On the other hand, Bowers said that Mother's continued mental instability was a result of failing to take her medications as prescribed. Bowers described a continuous cycle where Mother would stabilize in the

7

hospital, get released, and then go "off her medication," necessitating another trip to the hospital. Bowers opined that Mother's "inconsistency [in] dealing with her mental health" would lead to an unstable home environment for B.M.P.J. Bowers also noted that although Mother had surrounded herself with supportive and positive influences at times, "she tends to go away from those people and end up with people that are not supportive of her." Bowers cited Mother's continued relationship with Father, who has a history of drug abuse, mental instability, and domestic violence. According to Bowers, Mother did not end her relationship with Father until October 2023, and while they were together, they could not maintain stable housing. At one point, they were living in a home without electricity or running water. Bowers pointed out that after Mother left Father, she began a romantic relationship with someone that Mother identifies as her girlfriend or wife. From what Bowers had heard and seen, this new person in Mother's life is a positive influence and "tr[ies] to help [Mother] be on the right path." However, Bowers said that after this relationship began, Mother then "had a new boyfriend or fiancé," but "now she's back with her wife." Bowers believed that the relationship with the boyfriend ended only days before Bower's January 3 testimony and that the relationship ended because of a domestic violence incident.

Bowers further testified that the Department had evaluated potential placements identified by Mother and Father, but these people either declined the placement or failed a background check. Instead, B.M.P.J. had been placed with the same foster family since his removal in September 2020. Bowers said that B.M.P.J. is "doing great" and "thriving" in his placement. The foster family has been able to address the child's medical and

developmental needs, including a successful surgery to treat hip dysplasia and completion of early childhood development services. B.M.P.J. was meeting developmental markers and showing "a lot of improvement," according to Bowers. Finally, Bowers testified that the family has expressed an interest in adopting B.M.P.J. and submitted a letter of intent to that effect.

### 2. Hope Demery

Hope Demery was the current Department caseworker assigned to the case at the time of trial. She was first assigned to the case in December 2023. She familiarized herself with the history of the case by reading the Department's records and discussing the case with the previous caseworker, Monica Gomez.

Demery had the opportunity to meet and observe B.M.P.J. at his foster placement and described him as "a very happy, bubbly, excited kid." Demery said that B.M.P.J. was bonded with another child that had been placed with the foster family, saying "they interacted well."

### 3. Mother

Mother testified remotely from a hotel room in McAllen. She said that she currently resides in a house with Janie Bell Chris in Brownsville, saying the house "has been clean and everything has been great in that house." Mother claimed that she ceased contact with Father "[a]t least [eleven] months" prior to her testimony on January 3, and although she referred to Chris as her "wife," Mother said they were planning to get married the following day. Mother also said that Chris would be the person to care for B.M.P.J. if she "were to go to the hospital." Mother believed that she would be able to financially support

9

B.M.P.J. because she receives Supplemental Security Income, receives benefits under the Supplemental Nutrition Assistance Program, and works fifteen hours a week as Chris's caregiver. Although Mother suffers from seizures, which prevent her from operating an automobile, she said that Chris has a vehicle and would be willing to drive B.M.P.J. to any appointments he may need.

Mother said she left Corpus Christi before her scheduled visit with her child and the resumption of the trial because she "had a family emergency." She explained that her cousin "has cirrhosis of the liver[,] and they called the family [to McAllen]" because the cousin was believed to be near death.

Mother acknowledged that she had been diagnosed with depression, anxiety, and PTSD but denied that she had been diagnosed as bipolar or schizophrenic with psychosis. She said that she has a psychiatrist, Cesar Marcos, and a counselor, Don Cooley, that she regularly visits "because they are the ones that [she] trust[s]." Mother explained that she does not "feel comfortable going through the Department" for these types of referrals. She claimed that Marcos has been her psychiatrist "for more than a year" and that Cooley has been her counselor for the past eight months. She said that she meets with Cooley in person and over Zoom and that he has helped her learn how to cope with her depression and anxiety. Mother acknowledged that she never informed the Department that she was receiving counseling services from Cooley.

Mother agreed that she had been admitted to "a behavioral hospital several times in the past year" but said the last instance was in November 2023, and she "wasn't there longer than a week." Mother said that due to successful treatment, she no longer "feel[s]

10

suicidal or homicidal." Mother said she is currently prescribed Clonazepam, she takes it as prescribed, and she is "doing great on [the] medication."

Under cross-examination, Mother acknowledged that she traveled to Corpus Christi for the January 2, 2024 visit and the January 3, 2024 trial setting with a male that she referred to as her "fiancé" when speaking to Demery. She clarified that although he was romantically interested in her, the feeling was not mutual, and she only referred to him as her fiancé because he pressured her to. Contrary to her previous testimony, she also admitted that she had been admitted to "South Texas Behavioral" as recently as December 22, 2023, through December 27, 2023. She also acknowledged that she received her current prescription for Clonazepam while she was at the hospital. Mother denied that she was "on any [illicit] drugs" during her testimony and disagreed with the suggestion that she was slurring her words.

### 4. Closing Arguments

Department's counsel argued that Mother appeared intoxicated during her testimony: "She's slurring her words. She's been unable to control her speech pattern." Mother's counsel objected that Department's counsel was effectively testifying. The trial court disagreed, saying "it is argument," and the court would "be the judge [of Mother's alleged intoxication]." The Department cited Mother's failures to comply with the service plan, mental instability, and overall inability to demonstrate a stable home environment as reasons to terminate her parental rights.

Mother's counsel countered that Mother had engaged in some of the specific services required by her plan and independently sought out other services that were

consistent with her plan. Counsel said that Mother's recent actions demonstrated that she "has made a substantial effort and progress in changing the situation that caused this case to occur in the first place." Under the circumstances, Mother did "everything that she could do," according to counsel. Mother requested that the Department be appointed the child's permanent managing conservator without terminating her parental rights.

The child's attorney ad litem felt the "Department ha[d] met their burden." In her opinion, Mother essentially got a second chance but did not take advantage of it. She noted that Mother did not begin services until a few weeks before trial began. The ad litem did not believe Mother's mental illness was an excuse because the Department had provided Mother with plenty of resources and support, and Mother simply failed to take advantage of them. She recommended termination because it would be in the child's best interest.

## F.    Trial Court's Ruling

The trial court terminated Mother's parental rights, finding by clear and convincing evidence that Mother "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition"; constructively abandoned the child after removal; and failed to comply with her court-ordered family service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(F), (N), (O). The trial court also found by clear and convincing evidence that termination was in the child's best interest. *See id.* § 161.001(b)(2). This appeal ensued.

## II.    STANDARD OF REVIEW

A parent has a constitutional right to the care, custody, and control of her child. *In*

12

*re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022); *In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020) (orig. proceeding). Accordingly, in proceedings to terminate the parent-child relationship, the petitioner is required to prove by clear and convincing evidence one of the statutory termination grounds and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In parental termination cases, our legal and factual sufficiency standards honor this elevated burden of proof while respecting the role of the factfinder. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* In a legal sufficiency review, we "cannot ignore undisputed evidence contrary to the finding, but [we] must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630–31 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Thus, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Factual sufficiency, on the other hand, requires us to weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* We "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per

13

curiam)). Therefore, "[e]vidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

In reviewing for factual sufficiency, we must be careful not to usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether to credit evidence and how to weigh its probative value is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility and demeanor. *Id.* In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' demeanor and credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

### III.    TERMINATION

Mother first argues that the evidence was legally and factually insufficient to support each of the termination grounds. We focus on the finding that Mother failed to comply with the court-ordered family service plan.[4]

---

[4] When termination is based on multiple statutory grounds, we will generally affirm if any one of those grounds is supported by legally and factually sufficient evidence *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam) (stating that "only one ground is required to terminate parental rights"). However, if a parent's rights were terminated under Subsections (D) or (E), we are required to review a sufficiency challenge to those grounds even if another ground would support termination. *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022); *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Mother acknowledges that Subsections (D) and (E) are not in play here. Consequently, we may affirm on any one of the three termination findings in this case. *See In re Z.M.M.*, 577 S.W.3d at 542.

Additionally, we are cognizant of the Supreme Court of Texas's recent warnings about the potential misuse of (O) grounds in termination proceedings. *See In re A.A.*, 670 S.W.3d 520, 531 (Tex. 2023). However, as explained below, "we are satisfied that is not what happened here." *Id.*

14

**A.	Applicable Law**

A parent's rights may be terminated if the child was removed from the parent's care "under Chapter 262 for the abuse or neglect of the child," the child has been in the State's custody for nine months, and the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain return" of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Failure to comply with a court-ordered service plan can support termination under Subsection (O). *In re A.A.*, 670 S.W.3d 520, 531–32 (Tex. 2023) (explaining that a family service plan "gives a parent like Mother an opportunity to have the child returned to her by demonstrating her parenting ability through compliance with the service plan"). "Notably, termination is not automatic or required, even if the Department properly proves a parent failed to comply with a specific plan provision." *In re R.J.G.*, 681 S.W.3d 370, 379 (Tex. 2023). Moreover, "strict compliance with every detail of a service plan is not always required to avoid termination under (O)." *Id.* Instead, the alleged violation must be a material requirement of the plan to justify termination under (O). *Id.* (collecting cases). Stated differently, "if the noncompliance is trivial or immaterial in light of the plan's requirements overall, termination under (O) is not appropriate." *Id.*

**B.	Analysis**

Focusing first on the circumstances of the child's removal, Mother contends that "the Department failed to present any evidence the child was in fact being abused or neglected by [Mother] at the time the service plan was implemented or he was removed." Mother's initial argument is twofold: (1) the Department was required to show by clear

and convincing evidence that Mother was actually abusing or neglecting B.M.P.J. at the time of his removal; and (2) the Department cannot merely rely upon its affidavit supporting the emergency removal or the terms of the service plan to support the trial court's finding.

Mother is correct that the reason for the child's removal functions as a "factual predicate to the application of (O)." *In re A.A.*, 670 S.W.3d at 529. But contrary to her suggestion, the removal predicate does not require the Department to show a history of actual abuse or neglect by the parent; instead, the statutory phrase "abuse or neglect of the child" broadly encompasses parental conduct that poses a substantial risk or threat to the health or safety of the child. *Id.* at 528 (citing *In re E.C.R.*, 402 S.W.3d 239, 247–48 (Tex. 2013) (explaining that the removal standard in Chapter 262 is "centered on risk, rather than just a history of actual abuse or neglect")). Removal may be necessary even if the child is not currently in the parent's physical or legal possession at the time of removal. *See id.* at 529 ("By their clear language, these orders confirm that the removal order legally removed the children from both Mother and Father, regardless of who had legal or physical possession of the children at the time."). Indeed, the Department "cannot leave [or place] a child with a parent whose conduct or home environment would endanger the child." *Id.* at 532. Further, when a parent challenges the sufficiency of the evidence to support the removal predicate under (O), we may look to the Department's affidavit supporting removal and the trial court's findings following the adversary hearing. *Id.* at 529–30; *In re E.C.R.*, 402 S.W.3d at 248–49 (collecting cases). In such cases, the supporting affidavit and the trial court's findings can "conclusively establish[] that [the

16

child] was removed from [the parent] under Chapter 262 of the Family Code for abuse or neglect." *In re E.C.R.*, 402 S.W.3d at 249; *see In re A.A*, 670 S.W.3d at 529–30 (concluding that "the record contains sufficient evidence that the factual predicate to the application of (O) has been met" after reviewing the supporting affidavit and the trial court's findings after the permanency hearing). With those ground rules in mind, we turn to the facts of this case.

The Department's supporting affidavit alleged the following facts. B.M.P.J. was initially removed from Mother at birth due to concerns over Mother's drug addiction and mental instability, as well as allegations of domestic abuse in the home. Mother's drug addiction was so severe that she consumed illicit drugs during her pregnancy and suffered a seizure in the hospital caused by withdrawal from crystal methamphetamine dependency. In anticipation of the possible return of the child, the Department asked Mother to submit to drug testing in October 2022. Her hair follicle test came back positive for amphetamine, methamphetamine, cocaine metabolite, codeine, and hydrocodone. Her urinalysis was positive for cocaine and hydrocodone. Mother was still residing with Father, and they were living in a home without running water or electricity. Mother reported to the Department that Father was selling drugs out of the home, and the Department received a report of continued domestic violence in the home. Finally, the Department received a report that Mother was not taking the medications prescribed to treat her mental illnesses and that Mother had recently expressed suicidal ideations.

Based on these allegations, the trial court entered emergency orders for the protection of the child, finding that the Department had made reasonable efforts to return

17

the child to Mother "but continuation in the home of [Mother] would be contrary to the child's welfare." The Department's allegations were put to the test during the subsequent adversary hearing, where Mother appeared in person and was represented by counsel. At the conclusion of the hearing, that trial court found that the removal was justified because "there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession from whom the child was removed." The trial court also made a finding that "there is a substantial risk of continuing danger if [the child] is returned [to the] home of [Mother]." Notably, Mother did not challenge these findings at the time they were made or later at trial. *See In re A.A*, 670 S.W.3d at 530 (observing that Mother could have, but did not, challenge the propriety of the temporary orders by mandamus, nor did she argue during the trial that the removal predicate under (O) had not been satisfied); *In re E.C.R.*, 402 S.W.3d at 248 & n.8 (same).

The record conclusively establishes that, at the time of removal, the Department could not return B.M.P.J. to Mother because her drug use, mental instability, and home environment posed an immediate danger to the physical health or safety of the child. *See In re A.A.*, 670 S.W.3d at 530 (finding that evidence of Mother's methamphetamine use satisfied (O)'s removal predicate). Mother's first sub-issue is overruled.

Mother next contends that the evidence was insufficient to establish that she "did not engage in the family service plan . . . [because she] completed *some* of the service plan." (Emphasis added). In other words, Mother implicitly concedes that she did not complete all the tasks in her service plan. However, when we view the evidence in the light most favorable to the trial court's judgment, the record establishes that Mother did

18

not complete *any* of her services and only began drug counseling approximately one month before trial began. Each service in her plan, including parenting classes, drug counseling, mental health counseling, and BIPP, was a material requirement that Mother needed to complete to demonstrate that she could provide B.M.P.J. with a safe and stable home environment. *See In re R.J.G.*, 681 S.W.3d at 379. To be sure, Bowers testified that Mother participated in the development of the plan and "was in agreement" that these services were warranted. Moreover, Mother also refused to drug test for the first nine months of the case (another plan requirement), which prevented her from visiting B.M.P.J. during that period (also a plan requirement).

Even if we credit Mother's testimony that she regularly met with her psychiatrist and mental health counselor—facts she never shared with the Department until trial—and considered these to be equivalent to the plan requirements that she "participate in a Psychological Evaluation" and "follow all recommendations made by the assessor," the overwhelming balance of the record establishes that Mother was substantially noncompliant with other material requirements in her plan.[5] *See id.* Therefore, under either sufficiency standard, a factfinder could have formed a firm belief or conviction that termination was appropriate under (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

---

[5] It should be noted that Mother has not challenged the sufficiency of the evidence to terminate her parental rights under (O) on the basis that her mental illness rendered her "unable to comply with specific provisions" of the service plan after having made a good-faith effort to comply. *See* TEX. FAM. CODE ANN. § 161.001(d) (providing an affirmative defense to termination on (O) grounds). Her trial counsel said as much in closing arguments when he suggested that Mother did "everything that she could do" under the circumstances. Of course, it is inappropriate for an appellate court "to review the record, research the law, and then fashion a legal argument for an appellant when [s]he has failed to do so." *Smith v. Smith*, 541 S.W.3d 251, 260 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Nevertheless, had this argument been properly raised, we would still conclude that the evidence supports termination under (O) because the record reflects that, despite her mental illness, Mother was capable of complying with the terms of her service plan but failed to make a good-faith effort to do so.

19

Mother's first issue is overruled.

## IV.  BEST INTEREST

Finally, Mother challenges the legal and factual sufficiency of the best-interest finding.

## A.  Applicable Law

The best-interest component of the termination analysis "is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). Although there is a "strong presumption" that keeping a child with their natural parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)), it is also presumed that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

Courts consider a nonexclusive list of factors to guide their best-interest analysis: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re J.W.*, 645 S.W.3d at 746 (citing *Holley* v. *Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). Each case is fact specific, and the Department is not required to prove that each *Holley* factor

20

favors termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

The Legislature has also provided guidance on factors for courts to consider, including "the results of psychiatric, psychological, or developmental evaluations of the . . . child's parents"; "whether there is a history of abusive or assaultive conduct by the child's family"; "whether there is a history of substance abuse by the child's family"; "the willingness and ability of the child's family to seek out, accept, and complete counseling services"; "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"; and "whether the child's family demonstrates adequate parenting skills." *See* TEX. FAM. CODE ANN. § 263.307(b)(6)–(8), (10)–(12). Finally, the same evidence that supports a termination ground may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28 (citing *Holley*, 544 S.W.2d at 370).

## B.     Analysis

Echoing her position at trial, Mother argues that she made recent improvements in her life that counsel against the best-interest finding. She points out that she left Father, she is now in a positive and supporting relationship with Chris, and her drug tests were negative over the last few months of the case. She also believes that she demonstrated a commitment to addressing her psychological conditions throughout the case. The Department counters that Mother's much longer history of severe substance abuse and unmanaged mental illness, as well as her failure to meaningfully engage in services or take the necessary steps to exercise visitation, overwhelmingly support the best-interest finding. The Department also argues that Mother's alleged self-improvement is not free

from contradiction or doubt. We agree with the Department.

As an initial matter, the trial court was free to weigh any recent improvements by Mother against her much longer history of endangering conduct when assessing whether termination was in the child's best interest. *See In re J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [appellant] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."); *Jordan v. Dossey*, 325 S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Although evidence shows [appellant] has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices."); TEX. FAM. CODE ANN. § 263.307(b)(11) (listing "the willingness and ability of the child's family to effect positive environmental and personal changes *within a reasonable amount of time*" as a best-interest factor (emphasis added)).

The record establishes that Mother consumed illicit drugs during her pregnancy (amphetamine and methamphetamine), and even after the child was removed, Mother continued to use drugs for the next several years (amphetamine, methamphetamine, cocaine, codeine, and hydrocodone), only getting clean a few months before trial began. *See In re A.J.D.-J.*, 667 S.W.3d 813, 825 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("[M]other's continued illegal drug use during the pendency of this case took place while she knew her parental rights were at stake. Continuing to use drugs under this circumstance indicates an inability or unwillingness to prioritize the burdens and responsibilities of parenthood ahead of the desire for intoxication . . . ."); *In re K.C.*, 219

22

S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (explaining that a factfinder can give "great weight" to the "significant factor" of a parent's drug-related conduct); TEX. FAM. CODE ANN. § 263.307(b)(8) (listing "a history of substance abuse by the child's family or others who have access to the child's home" as a best-interest factor). Bowers testified that Mother was charged with marijuana possession during the pendency of the case—a fact Mother did not dispute—and that Mother's refusal to drug test for the first nine months of the case prevented her from exercising visitation with B.M.P.J. "[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs." *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.)); *see also In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.) (finding that "Father's failure to submit to drug testing, through which the trial court could infer Father's continued prescription drug abuse, is relevant to multiple *Holley* factors"). Missing drug tests is also evidence that a parent failed to take advantage of available support systems. *C.C. v. Tex. Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 219 (Tex. App.—Austin 2022, no pet.). Mother's substantial history of hard drug use before and during the majority of this case, even when weighed against her recent sobriety, is a fact that strongly weighs in favor of the best-interest finding. *See In re J.O.A.*, 283 S.W.3d at 346.

Although the parties disagreed on Mother's exact diagnoses, it was undisputed that Mother regularly admitted herself into behavioral hospitals and had expressed

23

suicidal and homicidal ideations during the pendency of the case. *See* TEX. FAM. CODE ANN. § 263.307(b)(6) (listing "the results of psychiatric, psychological, or developmental evaluations of the . . . child's parents" as a best-interest consideration). Mother testified that she had recently found mental stability, which she attributed in part to a new medication she was taking. However, Bowers testified that Mother's repeated hospitalizations were a direct result of Mother's failure to take her medications as prescribed, a contention that Mother never disputed. *See Adams v. Tex. Dep't of Fam. & Protective Servs.*, 236 S.W.3d 271, 280 (Tex.—App. Houston [1st Dist.] 2007, no pet.) (sustaining best-interest finding and citing as a factor Mother's "mental health problems, including her . . . repeatedly going to hospitals and calling for emergency assistance, and the possibility that she could discontinue taking her medication"); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (finding mother's suicidal thoughts and history of noncompliance with medication schedule relevant to endangerment analysis). It was also undisputed that Mother was last admitted to a behavioral hospital from December 22, 2023, until December 27, 2023, and it was during this hospitalization that she received her new prescription. These facts undermined Mother's claim of mental stability on January 3, 2024. While Mother's willingness to admit herself into behavioral hospitals is laudable, the record establishes that her ongoing mental instability was at least partially attributable to her own choices. Her history of failing to take her medications as prescribed could be construed by the factfinder as an unwillingness or inability "to effect positive environmental and personal changes within a reasonable period of time." *See* TEX. FAM. CODE ANN. § 263.307(b)(11).

24

Additionally, it was undisputed that Mother failed to seek a psychological assessment or counseling through her service plan, and although Mother testified that she independently sought treatment through a psychiatrist and counselor, she never reported these visits to the Department, and the trial court was free to weigh the credibility of Mother's testimony. *See In re S.R.*, 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("This evidence of the parents' failure to comply with services to improve their mental health is a factor that the trial court could have considered in finding that the parents engaged in a course of conduct that endangered the physical and emotional well-being of the Children."). Regardless, Mother's failure to properly manage her mental illness through medication was a fact that weighs in favor of the best-interest finding.

As detailed above, Mother also failed to meaningfully engage in her service plan. *See id.* § 263.307(b)(10). She did not complete a single service, and she only began her drug counseling the month before trial began. *See In re J.W.*, 645 S.W.3d at 747–48 ("[T]he same evidence that supports termination of Father's rights under Subsection (O) also supports the best-interest finding." (citing *In re J.F.C.*, 96 S.W.3d at 275)); *In re E.C.R.*, 402 S.W.3d at 249 ("Many of the reasons supporting termination under subsection O also support the trial court's best interest finding." (citing *In re C.H.*, 89 S.W.3d at 28). "A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of h[er] child that [s]he does not have the ability to motivate h[er]self to seek out available resources needed now or in the future." *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet.

25

denied); *see Holley*, 544 S.W.2d at 372 (listing parental abilities of individual seeking custody as best-interest factor). This factor also weighs heavily in favor of the best-interest finding.

Finally, given the fact that Mother only visited B.M.P.J. twice in the several years since his initial removal at birth, "the factfinder could have reasonably found that no meaningful parent-child bond existed." *See In re A.J.D.-J.*, 667 S.W.3d at 832–33 ("Having visited her one-year-old child infrequently and irregularly after the child was removed from her care at birth, the mother does not have a relationship with her child."); *In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child . . . has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires."); *see also In re N.S.M.*, No. 01-20-00764-CV, 2021 WL 1217328, at *4 (Tex. App.—Houston [1st Dist.] Apr. 1, 2021, pet. denied) (mem. op.) (holding factfinder could have reasonably found that no parent–child bond existed, given that 14-month-old child was removed from mother's care after birth and mother had visited only three or four times in preceding nine months). In contrast, it was uncontested that B.M.P.J. was well cared for in his foster placement—the only family he had ever known. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest."). It was also uncontested that B.M.P.J. had bonded with his foster family, who were looking forward to adopting him. *See In re C.H.*, 89 S.W.3d at 28 ("Evidence about placement plans and adoption are, of

course, relevant to best interest."). When considering the need for permanence and the lack of a relationship between Mother and child, this factor weighs heavily in favor of the trial court's best-interest finding. *See In re J.W.*, 645 S.W.3d at 746; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (explaining "that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs").

Having considered the entire record under the appropriate standards of review, we conclude that the trial court could have formed a firm belief or conviction that terminating Mother's parental rights was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Consequently, the evidence was legally and factually sufficient to support the trial court's best-interest finding, and Mother's second issue is overruled.

## V.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
5th day of July, 2024.

27